NOTICE

Decision filed 1/31/06. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-05-0498

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| *In re* MARRIAGE OF WILLIAM D. ARCHIBALD, | ) Appeal from the<br>) Circuit Court of<br>) Bond County. |
| Petitioner-Appellee, | ) |
| and | ) No. 03-D-59 |
| CHRISTIANA D. ARCHIBALD, | ) Honorable |
| Respondent-Appellant. | ) John Knight,<br>) Judge, presiding. |

_____

JUSTICE HOPKINS delivered the opinion of the court.

Christiana D. Archibald, the respondent, appeals from the judgment of the circuit court of Bond County awarding William D. Archibald, the petitioner, the custody of Kyle Behrens, William's stepson and Christiana's biological child, and Joseph Archibald, Christiana and William's biological child. We affirm.

FACTS

On July 23, 2003, William filed a petition for the dissolution of the parties' marriage. The petition sought, *inter alia*, the custody of Kyle and Joseph. William also filed a petition for temporary relief, seeking the custody of Kyle and Joseph and child support.

On August 15, 2003, the court held a hearing on the petition. Christiana appeared *pro se*. The parties agreed to the entry of an order allowing William the temporary custody of Kyle and Joseph, awarding Christiana at least seven days per month of visitation, ordering Christiana to pay William $175 every two weeks for child support, and ordering Christiana to provide health insurance for Kyle and Joseph.

1

On October 5 and November 8, 2004, the court held hearings on the petition. The following evidence was adduced at the hearings.

Christiana testified that Kyle is her son and that his biological father is Kevin Behrens. Christiana testified that although she maintains contact with Kevin, he does not visit with Kyle very often. Christiana testified that Kevin last visited with Kyle in 2001 or 2002 and that she took Kyle to see Kevin at that time.

Christiana testified that she left William in December of 2001 and that she initially had custody of Kyle and Joseph. Christiana claimed that when William gained custody of Kyle and Joseph, she and William verbally agreed that Kyle and Joseph would live with him until the end of the school year and that, thereafter, they would live with her in Chicago. Christiana complained that William would not communicate with her during this time.

In September of 2002, Christiana moved into a one-bedroom apartment in Chicago with her boyfriend, William Jeter. Christiana testified that she moved to Chicago to continue her education and care for Kyle and Joseph. Although she claimed that she continued her education, she admitted that she did not care for Kyle and Joseph. She denied that she moved to Chicago to be with Jeter. Christiana testified that Jeter gets along well with Kyle and Joseph and helps care for them when they visit. According to Christiana, when Kyle and Joseph visit with her and Jeter, she, Kyle, and Joseph sleep in the bedroom and Jeter sleeps on the couch. Although Christiana testified that she had since moved into a two-bedroom apartment, she admitted on cross-examination that she still lives in the one-bedroom apartment with Jeter and merely has an option to rent a two-bedroom apartment should she receive the custody of Kyle and Joseph.

Christiana testified that she had a job awaiting her when she moved to Chicago. At the time of the hearings, Christiana was employed by St. Francis Hospital as an emergency medical technician. In April of 2004, her net income was $731.06 every two weeks.

2

Christiana testified that when Kyle and Joseph visit her, they have access to the apartment complex racquetball court and swimming pool. Christiana stated that Kyle and Joseph enjoy playing games on her computer and that she takes them to amusement parks and horseback riding.

Christiana testified that if she were awarded the custody of Kyle and Joseph, Joseph would attend a day care at her workplace. The day care has various activities and clubs for the children. Kyle would attend Dirksen Elementary School, which is three blocks from her apartment. Christiana provided brochures of the school, which show that the school has a strict discipline policy and requires students to wear uniforms. The school and nearby churches have numerous clubs and activities. Christiana testified that Kyle's current school does not have such programs.

Christiana testified that she keeps a book of Kyle's academic progress. According to Christiana, Kyle's language, math, science, and health grades have dropped from As to Cs and Ds. Christiana acknowledged that Kyle received As in reading and social studies and Bs in spelling and reading comprehension. She could not name Kyle's fourth- and fifth-grade teachers, and she was not aware that Kyle signed his name "Kyle Archibald."

Christiana recalled that, during the marriage, William's discipline of Kyle and Joseph was inconsistent, but she acknowledged that William was affectionate with Kyle and Joseph. Christiana testified that William was on medication for depression and obsessive-compulsive disorder but discontinued taking the medication due to financial constraints. When William discontinued the medication, he became "hateful" and talked to Christiana with clenched teeth. Christiana testified that while William did not behave this way in front of Kyle and Joseph, his discipline with them was harsh. When asked how many times she had seen William spank Kyle and Joseph, Christiana stated that she saw William spank them between three and five times. Since the end of 2001, when Christiana and William separated, she has

3

not seen any marks on either child. Christiana testified that in 2000, when she and William were still together, William spanked Kyle and left marks on his body.

Christiana acknowledged that her visitation schedule with Kyle and Joseph was unpredictable. Christiana testified that she had difficulty exercising visitation due to her work schedule. She admitted that she did not see Kyle and Joseph in June of 2004. She also agreed that she did not pay child support from November of 2003 to May of 2004.

Christiana complained that William denied her visitation with Joseph on one occasion and that he was late for visitations on other occasions. During the summer of 2004, Christiana noticed that Kyle and Joseph were dirty and smelly and that their clothes were dirty and too small. On three visits, Kyle and Joseph had head lice, and one time, Christiana noticed that Kyle and Joseph had flea bites. When Christiana complained about Kyle's and Joseph's appearances, William became agitated.

On October 16, 2004, William's car broke down while he was on his way to pick Kyle and Joseph up from a visit with Christiana. Christiana picked William up and drove William, Kyle, and Joseph back to his home. Christiana went inside the home while William walked the dog. She testified that the house was "unkept" and "dirty." While there, Christiana went into the bathroom and noticed that there was a foul odor and sewage residue in Kyle and Joseph's bathtub. Kyle and Joseph used the bathtub in William's bathroom. Christiana testified that the sewer had been a recurring problem since she had lived there and that William told her that he did not have time to fix the problem.

Christiana testified that Kyle and Joseph are on her prescription plan and that William does not know how to properly use the card. Christiana admitted that she had William's telephone disconnected because the bill had not been paid and they had argued about it.

Christiana denied that she and Jeter had ever broken up. Christiana acknowledged that she stayed with a man named Terry, Jeter's distant relative, for two weeks because he

4

could give her a ride to work. She did not know Terry's last name and denied that he was a boyfriend. Christiana admitted that she, Terry, Kyle, and Joseph spent the night together in a motel in Litchfield. However, she testified that Kyle and Joseph slept with her in the bed and that Terry slept on the floor.

According to Christiana, she voluntarily left Kyle and Joseph with William in September of 2002 when she moved to Chicago. She believed that their divorce would be final in a "few weeks" or a "few months." Christiana testified that since she moved to Chicago, she had enhanced her skills, knowledge, and income. Although she acknowledged that she could have made these improvements while Kyle and Joseph were in her physical custody, she agreed that she did not have custody of Kyle and Joseph during this time. Christiana claimed that she and William had a verbal agreement to move Kyle and Joseph to Chicago with her at the end of the academic school year. Christiana testified that William changed his mind and became uncooperative and that their communication worsened.

Christiana testified that she agreed in August of 2003 to an order that allowed William to have temporary custody of Kyle and Joseph. Christiana stated that she did not have an attorney at that time, and she claimed she believed that opposing counsel was a mediator attempting to negotiate a settlement between the parties. Christiana claimed that William's counsel told her that the agreed custody would "only be for a few months."

William testified that he lives with Kyle and Joseph in the former marital home in Smithsboro, Illinois. William testified that he has had physical custody of Kyle and Joseph since August of 2002. William is employed by Wicks Aircraft. At the time of the hearing, William had recently taken a different position with the company so he could get Kyle and Joseph ready for school and day care. William testified that he took a $4-per-hour pay cut when he changed positions.

William testified that he loves Kyle and Joseph "like nothing else on earth." William

5

performs the majority of the cooking and cleaning, with help from Kyle and Joseph. William took Kyle and Joseph to the St. Louis Science Center, fishing, horseback riding, and for play dates with other children. William and the children regularly attend church at the Greenville Free Methodist Church, where William plays the saxophone. William testified that his social life revolves around activities with Kyle and Joseph.

Kyle and Joseph have a close relationship with William's mother, who resides in Florida. She calls and speaks with them every Sunday. Kyle also speaks by telephone with his biological paternal grandparents and last visited with them in August of 2001. Although William has attempted to contact Kevin, Kyle's biological father, he has had no success. William left telephone messages for Kevin on Kyle's birthday and on Father's Day, but Kevin did not return his calls.

During weekdays, William takes Joseph to day care and Kyle to a friend's house to wait for the school bus before he goes to work. Kyle attends Mulberry Grove Elementary School. Kyle's class size is small and the teachers are accessible. William knew the names of Kyle's current teacher and his teacher from the previous school year. William regularly meets with Kyle's teachers to monitor his progress. When Kyle received a D in social studies, William met with his teacher to discuss it. William attended all parent-teacher conferences, while Christiana did not attend any. William acknowledged that he was aware that Kyle signs his name on his school papers as "Kyle Archibald," but he testified that he reminds Kyle that his last name is Behrens. Christiana is listed as Kyle's mother on school records, and she could obtain information about Kyle's progress.

William testified that when he, Kyle, and Joseph return home each evening, they prepare dinner and wash the dishes. William helps Kyle with his homework. Kyle and Joseph take a bath and go to bed. William testified that Kyle usually reads when he first gets into bed and that William reads a bedtime story to Joseph. William sought counseling for

6

Kyle because he was "an upset child and *** needed counseling."

Kyle suffers from Sturge-Weber syndrome, a neurological disorder that produces seizures. Due to his illness and the fact that he is a child, the longest that William has ever left Kyle alone was to walk the dog. Kyle had been seizure-free for several years until the summer of 2004. William, Kyle, and Joseph were visiting William's mother in Florida when Kyle had a seizure. Kyle was taken to a hospital, where he remained overnight. He was treated and released. William admitted that he did not immediately contact Christiana; he stated that the seizure occurred late in the evening and his focus was on Kyle. William also testified that he was unable to contact Christiana when Kyle had a couple of minor medical issues, because Christiana would not give him her home telephone number.

When William attempted to use Christiana's prescription card to obtain Kyle's medication, he learned that Kyle was not on her prescription plan. William paid full price for the medication. At the time of the hearing, William was unable to use the prescription card to obtain medicine for Kyle and Joseph.

William admitted that Kyle and Joseph had head lice while in his custody. William received a notice from Kyle's school that some children had head lice. After noticing Kyle scratching his head, William treated the children for head lice, stripped their bedding, boiled their clothing and bedding, and cleaned his car. William did not see flea bites on Kyle and Joseph while they were in his custody, but they did have flea bites when Christiana was residing with them in the marital home. William treated the dog, and the fleas disappeared.

William agreed that there were instances when Kyle's and Joseph's clothing was too small. William testified that this situation occurred between seasons when he had not had the opportunity to update the children's wardrobes. William testified that he purchased properly fitting clothing as soon as he was able to do so. William testified that the only clothing Christiana purchased for either child after she moved to Chicago was one winter coat she

7

purchased for Joseph. William acknowledged that sometimes Kyle's and Joseph's clothing was dirty when he took them for visitation with Christiana; he stated that he picked them up from school and day care and drove directly to meet Christiana.

William also acknowledged that when Christiana visited his residence in October of 2004, the children's bathroom had a sewer problem. William testified that the sewer problem had been repaired.

William testified that he is hypoglycemic and has obsessive-compulsive disorder. He testified that he sought treatment for both conditions. Although William had been on medication for obsessive-compulsive disorder, he discontinued taking the medication in 2002, with his physician's permission, because he felt better without the medication.

William admitted that in June of 2000, he slapped Kyle in the face and left a mark that lasted about one week. According to William, he lost control of his temper because he had a bad day. Christiana was aware of the incident and took pictures to show the Department of Children and Family Services (DCFS). DCFS became involved, and William sought counseling. William testified that he learned to control his anger by talking about it. William testified that his DCFS caseworker told him that spanking on the bottom was an appropriate discipline. William stated that he continues to give Kyle and Joseph one slap on the bottom if a time-out does not work; however, he stated that he rarely needs to do so.

William testified that after he and Christiana separated in December of 2001, Kyle and Joseph initially resided with Christiana even though Kyle and Joseph stayed with him three to four nights per week while Christiana was working. During that time, Christiana called William to help with Kyle's behavior and homework problems. William denied that he had an agreement with Christiana that the children would remain with him for the school year and reside with her thereafter.

In February of 2002, William learned that Kyle had been left alone after school, and

8

he arranged for friends to watch Kyle after school. In May of 2002, Christiana told William that Joseph, who was two years old at the time, had been left alone all day at her residence. She explained that she had forgotten to take him to day care and that she did not tell Jeter. Jeter took Kyle to the school bus and left Joseph home alone. When Christiana returned home from working, Joseph was crying and had a wet and dirty diaper.

William testified that he has had sole physical custody of Kyle and Joseph since August of 2002. William testified that in September of 2002, Christiana agreed that Kyle and Joseph should remain with William when she moved to Chicago. Although Christiana initially visited Kyle and Joseph twice a month, she began seeing them only once a month. William testified that one month, she did not see them at all.

In 2002, William learned that during Christmas vacation with Christiana, Kyle, who was eight years old at the time, was left alone in her Chicago apartment for the entire day. Christiana told William that a Spanish-speaking woman checked on Kyle. In June of 2003, William called to speak with Kyle on the telephone, and Christiana refused to allow Kyle to speak with him. William testified that he has picked Kyle and Joseph up in Chicago when Christiana asked him to do so. In August of 2003, William discovered that Christiana and a man named Terry had spent the night with Kyle and Joseph in a hotel in Litchfield. William testified that Kyle and Joseph slept in the same bed with Christiana and Terry.

William testified that even though he paid the outstanding telephone bill, Christiana had the telephone disconnected. William has a cellular phone, and Christiana calls that number to speak with Kyle and Joseph.

William testified that Jeter carries a gun on his person as a part of his job. The gun is not concealed and has no restraining strap, allowing easy access to the weapon. William testified that he keeps his firearms and ammunition in locked containers in his bedroom.

William testified that he did not receive child support from November 5, 2003, to May

9

10, 2004. Christiana exercised the full amount of visitation for approximately two to three months. Thereafter, she visited with Kyle and Joseph one weekend per month. In the summer of 2004, William agreed that Christiana could have Kyle and Joseph for three weeks. William testified that 10 days later, Christiana called and asked him to get the boys, and he did so. William testified that in May of 2004, Christiana visited with Kyle and Joseph one weekend. In June of 2004, Christiana did not visit with them. In August and September of 2004, Christiana visited with them two weekends each month.

Delores Tevis, a former Smithsboro mayor, testified that she is William's neighbor, that she saw William, Kyle, and Joseph every day, and that she never saw William without the children. Tevis testified that Kyle and Joseph are well-mannered and polite and are always clean and well-dressed. Tevis considers William a good father because he spends more time with Kyle and Joseph than any other father that she knows. Tevis testified that William is a volunteer fireman and that Kyle and Joseph attend fire department meetings with him. Tevis observed that William is affectionate with Kyle and Joseph and that they respect him. Tevis also stated that William, Kyle, and Joseph regularly attend church.

Rebecca Roberts, former director of children's ministries at Greenville Free Methodist Church, testified that she knows William, Kyle, and Joseph because they attend the same church. Roberts testified that William, Kyle, and Joseph regularly attend church. Roberts, who was also Kyle's Sunday school teacher at one time, noted that Kyle seems to be well-adjusted and is "[v]ery precious, very loving, open[,] and just a very sweet boy." Roberts stated that Joseph is more outgoing. Roberts testified that Kyle and Joseph look well-fed and clean. Roberts testified that Kyle and Joseph are "typical boys" but not "out of control." Roberts testified that William is the "most devoted father" that she has ever seen and that William's life revolves around Kyle and Joseph and that he loves them with "all of his heart."

Steven Trull testified that he has known William for three or four years. Trull and

10

William play in a church musical group together. Trull testified that Kyle and Joseph are respectful of William and that they are clean and appropriately dressed. Trull also testified that William is affectionate with the children.

Greg Groves, associate youth pastor of Greenville Free Methodist Church, testified that he has babysat for Kyle and Joseph for short periods of time. William, Kyle, and Joseph visited with Groves' family numerous times, and Groves' children, Kyle, and Joseph are friends. Groves opined that William has "sacrificed" to care for Kyle and Joseph and to spend more time with them. Groves testified that William plays with Kyle and Joseph, works with them on chores, and runs errands with them. Groves believes that Kyle and Joseph enjoy being with William. Groves testified that although William does not complain about it, he has no social life because he is with Kyle and Joseph all the time. Groves has seen William verbally discipline Kyle and Joseph, and they complied. Groves described William's discipline as "firm" but "loving." Groves testified that Kyle and Joseph are always neat, clean, well-dressed, and well-fed. Groves testified that Kyle and Joseph are affectionate with William, "anxious" to be with him, and glad to see him after they have attended the children's programs at church.

Groves also testified that he knows Christiana because she was a custodian at the church for a few months. Groves testified that the church "let her go," but he did not know why. However, Groves noted that he had seen Christiana and Jeter studying late at night in the church conference room and that Jeter did not work at the church.

Michael Strong testified that he had known William for approximately one year and had been to William's home about six times because their children played together. Strong described William's home as "very clean." He stated that he did not know there was a dog in the house until he saw the dog. Strong testified that William's house had "an amazing lack of clutter" for a house with two children and that Kyle and Joseph are always neat, clean, and

11

well-mannered. He described Kyle and Joseph as "very pleasant young men."

Sherry Parker, Christiana's mother, testified that she saw Kyle and Joseph when Christiana visited her. Although she testified that Kyle and Joseph are happy when they are with Christiana, she claimed that Kyle had some "anger issues" and was short-tempered. Parker testified that she had difficulty contacting William by telephone over the previous few months but clarified that, in general, William allowed her to see the children and talk with them on the telephone. Parker went to William's home in June of 2004 to borrow a rototiller. Parker testified that when she saw the children, William brought them to her. Parker testified that when she saw the children, they were dirty.

Parker testified that Christiana disciplined the children with time-outs and, to her knowledge, had never spanked either boy. Parker believed that Dirksen Elementary School would be better for Kyle but admitted she knew nothing about the Smithsboro school district.

Kyle testified that he enjoys spending time with Christiana and William. Kyle's testimony demonstrates that he does not get along with Jeter. Kyle testified that he and Joseph sleep on the couch when they visit Christiana in Chicago and that she and Jeter sleep in the bedroom. Kyle testified that he loves his school and that he would miss his best friend if he moved to Chicago.

Following the hearings, the court requested that William address his standing to seek the custody of Kyle. William addressed the issue of standing in a written closing argument and stated that Christiana should respond. In Christiana's closing statement, she argued that it was in Kyle's best interest that she be awarded custody because she is his natural mother.

On January 31, 2005, the circuit court entered an order awarding William the custody of Kyle and Joseph. The court determined that William had standing to seek the custody of Kyle pursuant to section 601(b)(2) of the Illinois Marriage and Dissolution of Marriage Act (Dissolution Act) (750 ILCS 5/601(b)(2) (West 2002)) and that he had overcome the

12

presumption in favor of Christiana, the natural parent.

Christiana filed a motion to reconsider. In a memorandum in support of the motion, Christiana, for the first time, challenged William's standing to seek the custody of Kyle. The circuit court denied the motion, and Christiana filed a timely notice of appeal.

ANALYSIS

On appeal, Christiana argues that the circuit court erred in determining that William had standing to seek the custody of Kyle. We disagree.

Here, the circuit court determined that William had standing to seek the custody of Kyle pursuant to section 601(b)(2) of the Dissolution Act, which provides, in pertinent part:

"(b) A child custody proceeding is commenced in the court:

\*\*\*

(2) by a person other than a parent, by filing a petition for custody of the child in the county in which he is permanently resident or found, but only if he is not in the physical custody of one of his parents[.]" 750 ILCS 5/601(b)(2) (West 2002).

On appeal, the determination of whether a nonparent has standing to seek custody is a question of law and is, therefore, reviewed *de novo*. *In re A.W.J.*, 316 Ill. App. 3d 91, 96 (2000), *aff'd*, 197 Ill. 2d 492 (2001). The nonparent bears the burden of proving that he or she has standing. *In re Marriage of Siegel*, 271 Ill. App. 3d 540, 542 (1995). Determining whether the nonparent has standing to seek the custody of a minor child requires an initial finding that the child is not in the physical custody of one of his parents. *In re Custody of Groff*, 332 Ill. App. 3d 1108, 1112 (2002). Standing, in the context of child custody, means that the court must initially conclude that a nonparent has the custody of the minor. *In re Custody of Groff*, 332 Ill. App. 3d at 1112. This standing requirement is designed to safeguard a natural parent's superior right to the care and custody of his or her children. *In re*

13

*A.W.J.*, 197 Ill. 2d at 497.

To a nonparent seeking custody, the issue of standing is critical. If the nonparent cannot establish standing, then he or she must plead and prove that the parents are unfit to have custody of the child. *In re Marriage of Sechrest*, 202 Ill. App. 3d 865, 870 (1990). Whether a nonparent has the custody of the minor child is determined by examining the nonparent's status on the date relief is sought. *In re Marriage of Brownfield*, 283 Ill. App. 3d 728, 739 (1996). In concluding that a nonparent has the physical custody of a minor child, the circuit court must consider factors such as who was responsible for the child's care and welfare prior to the initiation of custody proceedings, how the physical possession of the child was obtained, and the nature and duration of the possession of the child. *In re Marriage of Brownfield*, 283 Ill. App. 3d at 736. Furthermore, the nonparent must show that the natural parent relinquished the legal custody of the child, rather than just physical possession. *In re Marriage of Dile*, 248 Ill. App. 3d 683, 686 (1993); see *In re Custody of Groff*, 332 Ill. App. 3d at 1112-13. This requirement places the burden upon the nonparent to show that the parent somehow voluntarily and indefinitely relinquished the custody of the child. *In re Petition of Kirchner*, 164 Ill. 2d 468, 491 (1995). Only after finding that the nonparent has standing can the circuit court turn to the issue of custody. *In re Marriage of Sechrest*, 202 Ill. App. 3d at 870. Upon determining that the nonparent has standing, the circuit court must determine custody utilizing the best-interest-of-the-child standard. *In re Marriage of Sechrest*, 202 Ill. App. 3d at 870.

In the instant case, the circuit court properly determined that William had standing to seek the custody of Kyle. William had been solely responsible for Kyle's care since August or September of 2002, when Christiana moved to Chicago. In August of 2003, which is long after the time that Christiana claims William was to return the children to her, Christiana agreed to the entry of an order allowing William the temporary legal custody of Kyle and

14

Joseph for an indefinite period of time.

Christiana argues that the 2001 verbal agreement with William to return Kyle and Joseph after the school year shows that she did not indefinitely relinquish the custody of them. William's testimony disputed that there was such an agreement. However, Christiana's excuse for her failure to regain the custody of Kyle and Joseph (William's lack of communication) is vague. She failed to specify how William prevented her from regaining the custody of Kyle and Joseph. In fact, Christiana testified that William only denied her visitation one time. Additionally, we note that initially Christiana exercised the full amount of visitation for about two to three months. Thereafter, she saw Kyle and Joseph one weekend per month. In the summer of 2004, William agreed that Christiana could have Kyle and Joseph for three weeks, but 10 days later, Christiana returned Kyle and Joseph to him. William testified that in May of 2004, Christiana visited with Kyle and Joseph one weekend and that in June of 2004, she did not visit with them at all. Moreover, Christiana did not initiate the custody proceedings. Hence, we find no merit to this argument.

Additionally, Christiana claims that she did not agree to the entry of the temporary order and that she was confused about the proceeding. Christiana claims that the agreement was not valid because she believed that William's attorney was a mediator. At the August 15, 2003, hearing, the following colloquy occurred:

"THE COURT: Mrs. Archibald, are you representing yourself today?

MS. ARCHIBALD: Today, yes.

THE COURT: Okay. We will note that Miss Archibald [*sic*] is present in open court *pro se*. *** Have there been any negotiations that would eliminate the need for hearing, or do we have to have a hearing today?

* * *

THE COURT: *** [Y]ou're agreeing that some kind of temporary order is

15

entered in the dissolution case; is that right?

MS. LAWINGER [William's attorney]: That's correct, your Honor.

THE COURT: And, you're agreeing to that, ma'am?

MS. ARCHIBALD: This is temporary because I didn't even–a lot of it I don't even agree–

THE COURT: I understand that. Listen to my question. There is apparently an agreement between the two of you that a temporary order be issued in the dissolution case; is that right?

MS. ARCHIBALD: Yes.

THE COURT: Okay. We are going to let Ms. Lawinger tell us what she thinks it is, Ms. Archibald. I will make sure that [it is] what you agreed to. Okay? Miss Lawinger.

[Miss Lawinger then explains the temporary custody order.]

THE COURT: *** [I]s that in fact your agreement?

MS. ARCHIBALD: Yes.

THE COURT: Okay. So, *** we are calling it by consent, wasn't technically set. You're waiving service of process for purposes of entering into this agreement. Not giving up any of your rights, not admitting anything in the [p]etition, and merely agreeing to a temporary arrangement with respect to the custody and visitation of the minors until the case can be called for hearing. Do you understand that, first of all, and is that what you wanted to do, secondly?

MS. ARCHIBALD: Yes."

Contrary to Christiana's arguments, the record shows that she was fully aware that William's attorney was not a mediator and that she understood what she was doing. The circuit court explained the proceedings to her, and she acknowledged that she understood and

16

agreed to the entry of the temporary order. Also, the record shows that no one promised Christiana that William would only have Kyle and Joseph for a few more weeks or months.

For the foregoing reasons, we find that the circuit court properly determined that William had standing to seek the custody of Kyle.

Christiana also argues that the circuit court's order awarding William the custody of Kyle and Joseph was against the manifest weight of the evidence and that she has a superior right to the custody of Kyle as the natural parent.

In child-custody disputes, it is an accepted presumption that a natural parent's right or interest in the care, custody, and control of the child is superior to a third person's claim, but the presumption is not absolute and serves only as one of several factors the courts use in resolving the ultimately controlling question of where the best interests of the child lie. *In re Petition of Kirchner*, 164 Ill. 2d at 508 (Miller, J., dissenting). The Dissolution Act recognizes and protects a natural parent's superior right to the legal custody of her child by requiring a nonparent seeking custody to first meet the standing requirements of section 601(b)(2), to be considered for custody under the best-interests standard without first establishing the parent's unfitness. *In re Custody of Peterson*, 112 Ill. 2d 48, 53 (1986). As we have already determined, William met the standing requirement for a nonparent.

In child-custody cases, the circuit court is in a superior position to observe and evaluate the witnesses' demeanor, and deference is to be given to the trial court's decision. *Connor v. Velinda C.*, 356 Ill. App. 3d 315, 323 (2005). Accordingly, we will not reverse the circuit court's determination concerning child-custody matters unless it is against the manifest weight of the evidence or a clear abuse of discretion. *Connor*, 356 Ill. App. 3d at 323. "A judgment is against the manifest weight of the evidence when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary[,] or not based on the evidence." *In re Custody of K.P.L.*, 304 Ill. App. 3d 481, 488 (1999). A circuit court's

17

finding is against the manifest weight of the evidence when a finding opposite to that reached by the circuit court is evident. The circuit court abuses its discretion when it acts arbitrarily without conscientious judgment or, in view of all the circumstances, exceeds the bounds of reason and ignores recognized principles of law so that substantial injustice results. *In re Marriage of Marsh*, 343 Ill. App. 3d 1235, 1240 (2003).

The Dissolution Act requires that the court determine custody in accordance with the best interests of the child, considering all the relevant factors, including (1) the parents' wishes regarding the child's custody, (2) the child's wishes, if appropriate, (3) the child's interaction and interrelationship with her parents, siblings, and any other person who might significantly affect the child's best interests, (4) the child's adjustment to his home, school, and community, (5) the mental and physical health of all the individuals involved, (6) the physical violence or threat of physical violence by the child's potential custodian, whether directed against the child or another person, (7) the occurrence of ongoing abuse, and (8) each parent's willingness and ability to facilitate and encourage a close and continuing relationship between the other parent and the child. 750 ILCS 5/602(a) (West 2002).

From the outset, we acknowledge that Christiana is Kyle's biological mother, a factor for us to consider in determining Kyle's best interest. Additionally, when considering the factors under the Dissolution Act to determine custody in accordance with Kyle's and Joseph's best interests (750 ILCS 5/602(a) (West 2002)), we note that both Christiana and William prefer to have the custody of Kyle and Joseph. Although Kyle was interviewed, he would not say which parent he preferred as his custodian.

With regard to Joseph's and Kyle's interaction and interrelationship with their parents, siblings, and any other person who might significantly affect their best interest (750 ILCS 5/602(a)(3) (West 2002)), we note that both Christiana and William take Kyle and Joseph numerous places and engage in various activities that they enjoy. William takes Kyle and

18

Joseph to church every Sunday. At William's home, Kyle and Joseph have chores, such as helping make dinner and washing the dishes. William helps Kyle with his homework. William attends all parent-teacher conferences and contacts Kyle's teacher when he is having academic problems. William sought counseling for Kyle because he thought that Kyle was depressed. According to several witnesses, Kyle and Joseph were always well-dressed, clean, and well-fed. Because William's morning routine with Kyle and Joseph interfered with his getting to work on time, he took a different position with less pay to ensure that Kyle and Joseph were prepared to go to school and day care. Several witnesses testified that Kyle and Joseph are affectionate with William and that they have a close relationship.

During the parties' separation, Christiana had problems with Kyle's behavior and assisting him with his homework, and she called William to intervene. While in Christiana's care after the parties' separation, Joseph, two years old at the time, was left alone for at least part of the day, if not the entire day. Prior to Christiana's move to Chicago, William learned that Christiana left Kyle alone after school. William promptly arranged for friends to watch Kyle after school until he could get home from work. William testified that Kyle had seizures and was never left alone while in his care. The only time that William left home without Kyle and Joseph was when he walked the dog. William explained Kyle's medical problems to Joseph, who knew to blow a whistle if Kyle had a seizure while William was walking the dog. Additionally, Christiana left Kyle, eight years old at the time, alone at her apartment while she worked. Although Christiana testified that Kyle and Joseph get along well with Jeter, Kyle testified that he and Jeter do not get along. Kyle and Joseph are close and enjoy each other. Given their bond, it would be in their best interest if they remain together. See *In re Marriage of Slavenas*, 139 Ill. App. 3d 581, 587 (1985) (it is usually in the best interests of the children that siblings should not be separated).

With regard to Joseph's and Kyle's adjustment to their home, school, and community,

19

we note that William's home is the only home they have ever known. Kyle testified that he loves his school and would miss his best friend if he moved to Chicago. On William's behalf, several witnesses testified that he was involved in the community and that the children are always with him at various events.

As to the mental and physical health of all the individuals involved, William admitted that he has obsessive-compulsive disorder and that he stopped taking the medication with his doctor's permission because he felt better while not taking it. There was no evidence that this condition affects his interaction with Kyle or Joseph.

Regarding physical violence, the threat of physical violence by the child's potential custodian, or ongoing abuse, William admitted that he slapped Kyle in 2000 and left marks on him. William sought help for his anger problem, and there has been no recurrence of the problem. William testified that since the incident in 2000, he had slapped Kyle and Joseph on the behind if either refused to mind but that he no longer slaps the boys out of anger. William testified that through counseling, he has learned to control his anger. Christiana agreed that she had not seen any marks on either child since the one incident in 2000.

Finally, the record shows that Christiana and William have very aptly pinpointed each other's faults. However, other evidence in the record shows that both parents are capable of promoting a close and continuing relationship between the other parent and the children.

After considering the evidence in light of the relevant factors to determine Kyle's and Joseph's best interests, we cannot say that the circuit court's judgment was against the manifest weight of the evidence. For these reasons, we conclude that the circuit court properly awarded the custody of Kyle and Joseph to William.

CONCLUSION

For the foregoing reasons, the circuit court's judgment is affirmed.

Affirmed.

20

SPOMER, P.J., and WELCH, J., concur.

NO. 5-05-0498

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* MARRIAGE OF<br>WILLIAM D. ARCHIBALD, | ) | Appeal from the<br>Circuit Court of<br>Bond County. |
| Petitioner-Appellee, | ) | |
| and | ) | No. 03-D-59 |
| CHRISTIANA D. ARCHIBALD, | ) | Honorable<br>John Knight, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

**Opinion Filed**: January 31, 2006

_____

**Justices**: Honorable Terrence J. Hopkins, J.

Honorable Stephen L. Spomer, P.J., and
Honorable Thomas M. Welch, J.,
Concur

_____

**Attorney for Appellant**  James E. Buchmiller, 102 East Main Street, Greenville, IL 62246

_____

**Attorney for Appellee**  Jane M. Lawinger, Lawinger Law Office, 106 South Fifth Street, P.O. Box 240, Vandalia, IL 62471

_____