# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*Dumiak v. Kinzer-Somerville*, 2013 IL App (2d) 130336

---

| | |
|---|---|
| Appellate Court Caption | MICHAEL JOHN DUMIAK, Petitioner and Respondent, v. MOLLY ANN KINZER-SOMERVILLE, Respondent-Appellee (Roman Dumiak and Ellen Deasy, Petitioners-Appellants). |
| District & No. | Second District<br>Docket No. 2-13-0336 |
| Filed | September 12, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The denial of a child's paternal grandparents' petition seeking custody of their grandson on the ground that they lacked standing under section 601(b)(2) of the Illinois Marriage and Dissolution of Marriage Act was upheld, since the grandparents failed to present evidence that at the time the grandparents filed their petition, the child's mother did not have physical custody of the child. |
| Decision Under Review | Appeal from the Circuit Court of Du Page County, Nos. 10-F-770, 11-D-248, 12-D-1122; the Hon. Linda E. Davenport, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

James C. Olita and Shelly A. Johnson, both of Olita & Johnson, P.C., of Geneva, for appellants.

Brian G. Hiatt, of Bourbonnais, for appellee.

Panel

JUSTICE ZENOFF delivered the judgment of the court, with opinion. Presiding Justice Burke and Justice Hudson concurred in the judgment and opinion.


**OPINION**

¶ 1      Petitioners, Roman Dumiak and Ellen Deasy, previously appealed from the trial court's *sua sponte* dismissal of their petition seeking custody of their grandson for lack of standing. We reversed and remanded. Petitioners now appeal from the trial court's denial of their custody petition following an evidentiary hearing on the issue of standing. For the following reasons, we affirm.

¶ 2                        BACKGROUND

¶ 3      Roman and Ellen (collectively, grandparents) are the parents of respondent Michael Dumiak. (Michael is not a party to this appeal.) On January 26, 2007, Michael married respondent Molly Kinzer-Somerville, who gave birth to their son, Elliott Dumiak, on February 6, 2007.[1] Except for a brief period of time immediately following Elliott's birth, Michael and Molly lived separately. Elliott resided with Molly until August 11, 2008, when he began living with grandparents. On October 31, 2010, Molly picked up Elliott from grandparents and took him to live with her.[2]

¶ 4      On February 4, 2011, grandparents filed a petition seeking custody of Elliott under section 601 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/601

---

[1]Molly's deposition testimony is in the common-law record on appeal and reflects that, when she became pregnant, she was a 17-year-old ward of the state. We glean from the guardian *ad litem*'s (GAL's) report (included in the common-law record on appeal but not admitted into evidence) that Michael was 23 years old when Elliott was born.

[2]We previously said that this happened on October 30, 2010, based on the GAL's report. *Dumiak v. Kinzer-Somerville*, 2012 IL App (2d) 120570-U, ¶ 2. We now rely on Ellen's testimony from the evidentiary hearing conducted on remand.

(West 2010)).[3] Trial on grandparents' custody petition commenced on May 22, 2012.[4] During the first witness's testimony, the trial court *sua sponte* dismissed the petition, concluding that grandparents lacked standing because Elliott was living with Molly on the date that the petition was filed. Grandparents appealed.

¶ 5    We reversed and remanded for an evidentiary hearing on the issue of grandparents' standing to seek custody under section 601(b)(2) of the Act (750 ILCS 5/601(b)(2) (West 2010)). *Dumiak v. Kinzer-Somerville*, 2012 IL App (2d) 120570-U, ¶ 37. We held, *inter alia*, that the trial court had erred in not hearing evidence on the issue of grandparents' standing, because the fact that Elliott was living with Molly on the date that grandparents filed their custody petition was, alone, insufficient to defeat grandparents' standing. *Dumiak*, 2012 IL App (2d) 120570-U, ¶¶ 23-24. We remanded to the trial court with directions to determine whether Elliott was "not in the physical custody" of Molly within the meaning of section 601(b)(2). We instructed that grandparents had to show that they had physical custody of Elliott because Molly voluntarily and indefinitely relinquished custody. We further instructed that the trial court should consider such factors as: who was responsible for Elliott's care prior to grandparents' filing of their petition, how grandparents obtained physical possession of Elliott, and the nature and duration of their possession. *Dumiak*, 2012 IL App (2d) 120570-U, ¶ 37 (citing *In re Custody of M.C.C.*, 383 Ill. App. 3d 913, 917 (2008)).

¶ 6    On remand, an evidentiary hearing on grandparents' standing commenced on March 26, 2013. Ellen testified that, after Elliott's birth on February 6, 2007, she saw him on Sundays, holidays, and special occasions. Beginning on March 23, 2007, grandparents also enjoyed more extended visits with Elliott. Between March 23, 2007, and August 11, 2008, grandparents had a total of 17 visits that amounted to 53 overnights at their home in Long Grove, Illinois. Ellen explained that the first overnight visit occurred after a "frantic" phone call from Molly during which she asked Ellen to pick up Elliott " 'right now.' " Molly did not tell Ellen when to return Elliott, until the next day when she asked that Elliott be returned the following day. Ellen testified that she and Molly usually agreed in advance as to when Elliott would visit grandparents and when he would return to Molly. Several visits were, however, unplanned, usually the result of a frantic phone call from Molly.

¶ 7    Ellen testified that, on the evening of August 11, 2008, she received a phone call from Molly, "hysterical again," saying that she had taken Elliott to the Elgin police station because it was a " 'safe harbor.' " Ellen acknowledged that, at that time, there was an order of

---

[3]The case was docketed as No. 11-D-248 and subsequently consolidated with Michael's previously filed, *pro se* visitation petition (No. 10-F-770). At the time, Molly and Michael were still married, and no petition for dissolution had been filed. Michael subsequently filed a petition for dissolution (No. 12-D-1122), which was consolidated with the other two pending cases.

[4]Prior to the trial, the court denied Molly's motion for leave to file an affirmative defense (lack of standing) or to vacate a previous agreed visitation order (which indicated that "standing issues" had been waived). This procedural background is not at issue in this appeal, but we fully discussed it in the prior appeal (*Dumiak*, 2012 IL App (2d) 120570-U, ¶¶ 26-35).

protection in effect against Michael that listed Molly and Elliott as the protected persons.[5] Ellen went to the police station, where she spoke to a Department of Children and Family Services (DCFS) worker on the phone. Ellen testified that, after the call, she understood that she was to take Elliott home with her.[6] Ellen next spoke to Molly on August 13, 2008. Molly thanked Ellen for picking up Elliott and said that she was very happy that Elliott would be living with grandparents. Ellen testified that Molly wanted to start paying grandparents child support and to set up visitation[7] between herself and Elliott.

¶ 8        Ellen acknowledged that Molly indicated that one of the reasons she wanted Elliott to live with grandparents was so that she could work on her GED. Otherwise, Molly provided no plan regarding how long Elliott was to live with grandparents. Grandparents never sought guardianship of Elliott and had no written agreements with Molly as to Elliott's living arrangement. Ellen did not believe that any documentation was necessary; they were all working together for Elliott's good.

¶ 9        Ellen further testified that, during the first 60 days that Elliott lived with grandparents, Molly saw him 3 times, supervised by Ellen. Thereafter, Molly's contact with grandparents and Elliott was sporadic. Ellen said that, from December 2008 until October 2010, Molly saw Elliott 16 times, with her visits ranging in length from 1 to 8 overnights. Molly always returned Elliott to grandparents; she never asked to keep him with her. Ellen decided when Molly could see Elliott and encouraged Molly to do so.

¶ 10        Ellen testified that in May 2010 Molly moved to a mobile home in Manteno, Illinois, with her boyfriend, Jason.[8] The mobile home had a bedroom for Elliott with a bed, toys, a television, and things on the wall. Ellen denied that Molly had proposed a schedule to transition Elliott back to living with Molly or that Molly had told Ellen that she was ready to take Elliott back to live with her. However, Ellen acknowledged that she granted Molly's request for more time with Elliott during the summer of 2010. Molly had Elliott for extended periods of time in July (13 overnights), August (11 overnights), and September (14 overnights). Ellen testified that, for part of the July and September visits, Molly sent Elliott

---

[5]We glean from Molly's deposition testimony that she thought it was necessary to take Elliott to the police station because Michael had been stalking her and breaking into her apartment. Ellen acknowledged on cross-examination that Molly had told her about Michael's violence. On redirect examination, Ellen's counsel sought to elicit testimony from Ellen that Michael had been incarcerated on August 11, 2008, but Ellen could not recall the dates of his incarceration. Roman testified that Michael was no longer incarcerated on that date.

[6]During Ellen's direct examination, the trial court asked grandparents' counsel if there had been a court order in place regarding a DCFS safety plan. Counsel responded that there was not. The court asked if there was a safety plan in place, and counsel said she was not aware of any.

[7]Our use of the term "visitation" or "visit" is intended in the colloquial sense, not as a legal term of art.

[8]We glean from the record that Molly had earned her GED by this time. Ellen's personal log, which was admitted into evidence, included an entry about Molly's "graduation."

-4-

to spend some time alone with Molly's friends, who Molly felt were like Elliott's other grandparents. Ellen also testified that the August visit was supposed to be for 14 nights, but that Molly returned Elliott early. Early in October 2010, Molly had Elliott for a 12-night visit, but she returned him to grandparents for a weekend in the middle of that time. Even after these extended visits, Molly always returned Elliott to grandparents.

¶ 11        Ellen testified that on October 31, 2010, Molly came to grandparents' house with Jason to pick up Elliott for a prearranged visit. Ellen said that Elliott did not want to go with Molly and Jason (transitions had been getting difficult over the summer), but Ellen reassured Elliott that she would pick him up from Molly's on Saturday (November 6, 2010, pursuant to her conversation with Molly). Ellen testified that Molly called her on November 3, 2010, and said that she wanted Elliott to live with her. Ellen asked Molly what she meant and reminded Molly that Ellen had already told Elliott that she was picking him up on Saturday (November 6). Molly told Ellen, " '[W]ell, that's going to change. He's going to live with me and Jason now. Jason's going to be his dad and he's going to live here.' " Ellen "kept saying please don't do this." Ellen testified that, as the conversation continued, Molly said she wanted to keep Elliott for a " 'trial period' " of about three months " 'so that Elliott could spend holidays with his real family.' " Ellen told Molly that grandparents were Elliott's "real family" and that it would be hard on Elliott "just to leave where his home is." Molly did not ask for any of Elliott's belongings. She told Ellen to keep Elliott's bedroom intact at grandparents' house, because Molly planned to have Elliott spend every weekend with grandparents. Ellen testified that, after the November 3 phone conversation, she thought that Elliott would continue to live with grandparents and that "Molly would work through this temporary [*sic*] she wanted to hang on to him for a longer period of time."

¶ 12        Ellen testified that Elliott did not spend every weekend with grandparents after the November 3, 2010, phone call. Ellen said that Molly "let" Elliott visit grandparents on the weekend of November 12, 2010, during the day on November 27 and December 8, 2010, and for an early Christmas celebration from December 17 to 21, 2010. Grandparents returned Elliott to Molly after each of the four visits. Ellen said that, after the Christmas visit, grandparents "would ask for visits" but Molly "would say no."

¶ 13        Ellen testified that, despite Molly's November 3, 2010, announcement, Ellen believed that Elliott would still live with grandparents. She explained that she did not keep Elliott after any of the four visits, because she "really thought Molly was going to be changing her mind and that [they] were going to go back to the way it was because it was working fine." Ellen admitted that Molly never indicated that she would be changing her mind.

¶ 14        Ellen further testified that, by the end of the week of November 13, 2010, she realized that Molly would not be returning Elliott to live with grandparents. Ellen described Molly's tone as changed: Molly stopped returning some of Ellen's calls; calls were shorter; Molly was upset that grandparents did not teach Elliott to respect her as a parent; and Molly was frequently angry with Ellen. At that point, although they still were "hoping" that Molly would return Elliott, grandparents began calling lawyers to help them pursue custody of Elliott. Ellen explained that they interviewed four lawyers, but none of them had experience with grandparent custody. It took about two months to retain a suitable lawyer, and then about two weeks to file the custody petition. By that time, Elliott had lived with Molly for

about three months.

¶ 15    Ellen emphasized that when Elliott lived with grandparents from August 11, 2008, until October 31, 2010, grandparents made all of the child care decisions and assumed all financial responsibility for Elliott. Molly did provide grandparents with her Medicaid card, which covered Elliott. Prior to Molly's November 3, 2010, phone call, Ellen never had any notion that Molly would keep Elliott. Ellen testified that the phone call was a complete surprise.

¶ 16    Roman testified consistently with Ellen. Additionally, Roman noted that, on Elliott's school forms, grandparents listed only their address, never Molly's. Grandparents took vacations with Elliott when he lived with them. Grandparents claimed Elliott as a dependent for tax year 2010 when they filed their return in 2011. Roman explained that, like Ellen, he expected Molly to return Elliott to them even after the November 3, 2010, phone call. Roman testified that he never "voluntarily let Elliott go." Grandparents rested.

¶ 17    Following the close of grandparents' case-in-chief, Molly moved for a directed finding. The court granted the motion, finding that: Molly and Michael were married on January 26, 2007, and were still married; Elliott was born on February 6, 2007; Molly was 18 years old when Elliott was born; Elliott lived with Molly for about 1½ years; Elliott was then in grandparents' "possession" from August 2008 until October 2010; grandparents allowed Molly "access" to Elliott, including overnights and extended periods of time, as determined by Ellen; on October 31, 2010, Molly retrieved Elliott; between October 31, 2010, and February 1, 2011, Molly permitted Elliott to visit grandparents four times; after each visit, grandparents returned Elliott to Molly, "[t]hereby relinquishing their claim of possession"; and grandparents filed their custody petition 96 days after Molly retrieved Elliott. The court concluded: "The paternal grandparents were not in possession of the child after October 31st of 2010 and the child was in the possession of his mother Molly. Therefore the petitioner's [*sic*] lack standing to proceed with their claim of custody under Section 601 ***." The court entered an order denying grandparents' custody petition. Grandparents timely appeal.

¶ 18                                    ANALYSIS

¶ 19    Grandparents argue that the trial court erred in denying their petition for lack of standing under the Act. Section 601(b)(2) of the Act provides that a custody proceeding may be commenced by a nonparent "only if [the child] is not in the physical custody of one of his parents."[9] 750 ILCS 5/601(b)(2) (West 2010); see *M.C.C.*, 383 Ill. App. 3d at 917. Our supreme court has interpreted section 601(b)(2) as a "standing requirement that ensures that the superior right of natural parents to the care and custody of their children is safeguarded." *In re Petition of Kirchner*, 164 Ill. 2d 468, 491 (1995), *abrogated on other grounds by In re R.L.S.*, 218 Ill. 2d 428, 444-47 (2006); see also *R.L.S.*, 218 Ill. 2d at 438 (observing that the natural parent's interest is " 'perhaps the oldest of the fundamental liberty interests' " (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000))).

_____

[9]We note that whether Michael had physical custody of Elliott was never at issue. In the trial court, Michael consistently took the position that he waived the issue of grandparents' standing and wanted them to have custody of Elliott.

¶ 20    "Whether a child is not in the physical custody of one of his parents is not subject to a clear test." (Internal quotation marks omitted.) *M.C.C.*, 383 Ill. App. 3d at 917. Physical custody is not determined based on who had physical possession at the time the petition was filed. *In re Custody of Peterson*, 112 Ill. 2d 48, 53-54 (1986); *M.C.C.*, 383 Ill. App. 3d at 917. To establish that the child is not in the physical custody of one of his parents within the meaning of section 601(b)(2), the nonparent must show that the parents no longer have physical custody of the child because the parents "voluntarily and indefinitely relinquished custody of the child." (Internal quotation marks omitted.) *M.C.C.*, 383 Ill. App. 3d at 917. To determine whether a parent voluntarily and indefinitely relinquished custody, the court should consider who was responsible for the child's care prior to the initiation of the custody proceedings, how the nonparent obtained physical possession, and the nature and duration of the possession. *M.C.C.*, 383 Ill. App. 3d at 917. No one factor is controlling, and the determination is highly fact-dependent. *M.C.C.*, 383 Ill. App. 3d at 917-18. The nonparent bears the burden of proving standing under section 601(b)(2).[10] *In re Custody of Groff*, 332 Ill. App. 3d 1108, 1112 (2002).

¶ 21    Whether a nonparent has standing under section 601(b)(2) presents a legal question, which we review *de novo*. To the extent that the trial court heard evidence and made findings of fact, we review those findings under the manifest-weight-of-the-evidence standard. *In re Guardianship of K.R.J.*, 405 Ill. App. 3d 527, 535 (2010). A finding of fact is against the manifest weight of the evidence if the opposite conclusion is clearly apparent or if the finding "is palpably erroneous and wholly unwarranted, is clearly the result of passion or prejudice, or appears to be arbitrary and unsubstantiated by the evidence." (Internal quotation marks omitted.) *K.R.J.*, 405 Ill. App. 3d at 536.

¶ 22    We pause to explain that, while Elliott lived with grandparents, Molly still retained legal custody of him. See *In re Marriage of Siegel*, 271 Ill. App. 3d 540, 547 (1995) (Hutchinson, J., dissenting) ("Parents have legal custody of their children by virtue of their status as biological parents."). That Molly asked grandparents to care for Elliott did not operate to relinquish her legal custody, which could have been changed only by a court order. *Siegel*, 271 Ill. App. 3d at 547 (Hutchinson, J., dissenting) ("[O]nly a court may grant, modify, or terminate (*i.e.*, force a parent to relinquish) legal custody."). Therefore, when Molly retrieved Elliott on October 31, 2010, she was entirely within her legal right to do so.

¶ 23    We now turn to the issue at hand, namely, whether grandparents demonstrated that Elliott was not in Molly's physical custody at the time they filed their custody petition on February 4, 2011. We find instructive *In re Custody of Menconi*, 117 Ill. App. 3d 394 (1983). In *Menconi*, the father asked the paternal grandparents to care for his daughter when the child's mother died two months after the child's birth. The child resided with the grandparents,

---

[10]It is true that a parent can intentionally waive her superior right to the custody of her child as protected by section 601(b)(2)'s standing requirement (*In re Custody of Groff*, 332 Ill. App. 3d 1108, 1113 (2002)) or can be deemed to have forfeited the right if she fails to timely raise standing as an affirmative defense (see *In re Custody of K.P.L.*, 304 Ill. App. 3d 481, 487 (1999)). However, we disposed of all asserted waiver and forfeiture issues in the first appeal. *Dumiak*, 2012 IL App (2d) 120570-U, ¶¶ 22, 26-34.

returning to her father for only short intervals. The father always returned the child to the grandparents, saying that he was unable to care for her properly. When the child was 6½ years old, the father "forcibly removed" her from the grandparents' home. *Menconi*, 117 Ill. App. 3d at 395. The father refused the grandparents' request to return the child to them. The grandparents filed a custody petition four days after the "abduction." *Menconi*, 117 Ill. App. 3d at 395. The trial court awarded custody to the grandparents. *Menconi*, 117 Ill. App. 3d at 395.

¶ 24    The father appealed, arguing that the grandparents lacked standing to seek custody because the child was in the father's possession when the proceedings were initiated. *Menconi*, 117 Ill. App. 3d at 395-96. As relevant here, the appellate court first concluded that the father had voluntarily relinquished physical custody of the child because the initial transfer was voluntary, the grandparents cared for the child for a long time, and the child was "firmly integrated" into the grandparents' household. *Menconi*, 117 Ill. App. 3d at 398. Therefore, the court reasoned, had the grandparents sought custody prior to the father's abduction of the child, they would have had standing. The court then held, "On these facts, we find the lapse of four days between the time of the abduction and the filing of the custody petition insufficient to reinvest the father with physical custody so as to deprive [the grandparents] of standing." *Menconi*, 117 Ill. App. 3d at 399.

¶ 25    As did the father in *Menconi*, Molly voluntarily and indefinitely relinquished custody of Elliott to grandparents. The following undisputed facts support that conclusion: on August 11, 2008, Molly voluntarily took Elliott to the Elgin police department and asked that grandparents care for him; from then until October 31, 2010, Elliott lived with grandparents, who provided for all of his needs and made all parental decisions; grandparents allowed Molly to have time with Elliott, as decided by Ellen; and until October 31, 2010, Molly always returned Elliott to grandparents. On these facts, Elliott was in grandparents' physical custody between August 11, 2008, and October 31, 2010, as Molly's attorney essentially conceded.[11] Because Elliott was not in Molly's physical custody during that time, had grandparents filed a custody petition prior to Molly's retrieval of Elliott, they would have enjoyed the status of standing under section 601(b)(2). See *Menconi*, 117 Ill. App. 3d at 399 (the grandparents "clearly would have had standing under section 601(b)(2) prior to the time of the abduction of the child by the father").

¶ 26    Nonetheless, that status was not permanent. We must determine grandparents' status as of February 4, 2011, the date they filed their petition. *In re Marriage of Archibald*, 363 Ill. App. 3d 725, 736 (2006) ("Whether a nonparent has the custody of the minor child is determined by examining the nonparent's status on the date relief is sought."). Specifically, we must decide whether Molly was "reinvest[ed] *** with physical custody so as to deprive [grandparents] of standing." *Menconi*, 117 Ill. App. 3d at 399. To be clear, Molly's

---

[11]During his argument in support of the motion for a directed finding, Molly's attorney argued that during the three months from October 31, 2010, until grandparents filed their custody petition on February 4, 2011, "physical custody of Elliott *changed* from the grandparents to Molly." (Emphasis added.)

*possession* of Elliott on February 4, 2011, was not sufficient, by itself, to defeat grandparents' standing. See *Kirchner*, 164 Ill. 2d at 491 (clarifying that "physical possession is not the same as physical custody"); *Menconi*, 117 Ill. App. 3d at 399 (holding that the father's four-day possession of his child was insufficient to reinvest him with physical custody and deprive the grandparents of standing). Rather, Molly's possession of Elliott on the date the petition was filed was a factor in deciding whether he was in her physical custody. To determine whether Elliott was in Molly's physical custody at the time grandparents filed their petition, we must examine all of the evidence of what happened between October 31, 2010, and February 4, 2011.

¶ 27 Grandparents do not dispute the trial court's findings that: after Molly's retrieval of Elliott on October 31, 2010, 96 days passed before grandparents filed their custody petition; Molly permitted grandparents to take Elliott four times during that period; and following each of the four visits, grandparents returned Elliott to Molly. Additionally, grandparents testified that, beginning October 31, 2010, and continuing through February 4, 2011, when they filed their custody petition, Elliott lived with Molly in her home in Manteno. Although grandparents testified that they maintained Elliott's bedroom at their house, they acknowledged that Elliott had his own furnished bedroom and belongings in Molly's Manteno home. Furthermore, grandparents never testified that they made any parental decisions or paid for any of Elliott's care after October 31, 2010. Ellen testified that grandparents asked Molly for visitation after December 2010 but that Molly refused their requests.

¶ 28 The undisputed evidence established that for over three months (96 days), from October 31, 2010, until February 4, 2011, Elliott lived with Molly continuously. Molly provided for all of Elliott's care. She made all parental decisions, including whether Elliott could visit grandparents, as well as the frequency and duration of those visits. During the three-month period from Molly's retrieval of Elliott until grandparents' filing of the custody petition, Molly reasserted her physical custody of Elliott, which she had previously relinquished to grandparents.

¶ 29 Moreover, grandparents' conduct during that three-month period evinced their acquiescence in Molly's reasserting physical custody, not merely physical possession, of Elliott. While previously Ellen had directed when Molly would be permitted to see Elliott, after Molly's retrieval grandparents sought Molly's permission to see Elliott and abided by her decisions. They recognized that Elliott had a home with Molly and returned him there after each visit as directed by Molly. Indeed, Ellen testified that, by the end of the week of November 13, 2010, she realized that Molly would not be returning Elliott to live with grandparents. Grandparents did nothing to assert any claim to custody until they filed their petition three months after Molly retrieved Elliott. On this record, grandparents failed to establish that Elliott was "not in the physical custody of one of his parents" (750 ILCS 5/601(b)(2) (West 2010)) on February 4, 2011, when they filed their petition. Accordingly, grandparents lacked standing under section 601(b)(2). See *Kirchner*, 164 Ill. 2d at 490 ("Given that section 601(b)(2) of the *** Act allows for custody to be vested in a nonparent without first finding unfitness, its application must be narrowly construed to ensure the sanctity of the family and the reciprocal familial rights of parents and their children.").

¶ 30        Any reliance on *Menconi* by grandparents is unavailing. In *Menconi*, the father "forcibly removed" or "abducted" his child,[12] while here Molly peaceably picked up Elliott as previously arranged with grandparents. Even more important, in *Menconi*, the grandparents virtually immediately asserted their claim to custody. Initially, they asked the father to return the child. When the father refused, the grandparents filed a custody petition within four days. *Menconi*, 117 Ill. App. 3d at 395. That is far different from grandparents here, who made no such requests of, or demands on, Molly. Instead, grandparents acknowledged Molly's parental authority over Elliott and waited three months to file a custody petition. Grandparents attempt to justify their delay on the basis that they had "no idea where to start in the legal process" and were "taken totally off guard by Molly's absconding with Elliott." Even assuming that to be true, grandparents do not explain how the grandparents in *Menconi* were more legally savvy than they were or why the grandparents in *Menconi* would not have been just as much surprised as they were by the parent's taking of the child.

¶ 31        Grandparents contend that the trial court's finding–that Molly's retrieval of Elliott "somehow shifted possession"[13] of Elliott from grandparents to Molly–was contrary to grandparents' testimony that they "never gave up possession," because they expected Elliott to be returned and they never stopped trying to get him back. Notwithstanding grandparents' assertions that they never stopped trying to get Elliott back and that they never agreed to Molly's keeping him, the undisputed evidence established that grandparents allowed three months to pass after Molly's October 31, 2010, retrieval of Elliott before doing *anything* to assert their claim to custody. Ellen acknowledged in her testimony that, although grandparents were hoping Molly would change her mind, Molly gave no indication that she would do so. Despite the fact that Ellen had directed Molly as to when to return Elliott from visits for over 26 months, grandparents did not tell Molly to return Elliott to them on November 6, 2010, as planned. Nor did grandparents attempt to pick up Elliott on the prearranged date. Grandparents could have documented their position by calling police to make a report that they believed that Molly was keeping Elliott wrongfully. On this record, the trial court's finding was not "palpably erroneous and wholly unwarranted" (internal quotation marks omitted) (*K.R.J.*, 405 Ill. App. 3d at 536) and therefore was not against the manifest weight of the evidence.

¶ 32        In their reply brief, grandparents characterize their conduct following October 31, 2010, as having allowed Molly to have extended time with Elliott. Grandparents elaborate that they "did not view the continued exchange of Elliott as Molly *** 'asserting custody' but rather

_____

[12]Although the facts surrounding the father's abduction in *Menconi* are not elaborated, we infer from the court's language that the father's conduct was somehow particularly egregious, if not violent. In contrast, despite grandparents' characterization of Molly as having "absconded" with Elliott, because she did not tell them of her intent to keep him, Molly certainly did not forcibly abduct Elliott.

[13]The trial court found that grandparents "relinquish[ed] their claim of possession." The trial court's use of the word "possession" was an inartful choice. Under section 601(b)(2), physical custody, not possession, was at issue.

as extended periods where Molly was exercising time with Elliott." Grandparents' characterization is belied by the evidence, which we have already discussed at length. Suffice it to say that after October 31, 2010, there was a complete change in who exercised parental control of Elliott. Prior to October 31, 2010, grandparents did; thereafter, Molly did.

¶ 33    Grandparents further argue that the trial court based its finding entirely on "where Elliott was physically located," which was contrary to our directive on remand. We agree with grandparents' assertion that the rule announced by our supreme court in *Peterson*, that standing does not turn on physical possession at the moment the custody petition is filed, applies to cases where the parent, rather than the nonparent, was in possession of the child. See *Peterson*, 112 Ill. 2d at 53-54 (citing with approval *Menconi*, wherein the appellate court held that the father's possession alone did not defeat the grandparents' standing). However, the trial court here heard evidence and made findings regarding the parties' conduct between October 31, 2010, and February 4, 2011. The trial court's decision was not based solely on Molly's possession of Elliott on February 4, 2011. Thus, the trial court's conclusion that grandparents lacked standing was not inconsistent with *Peterson*.

¶ 34    Nor is a different conclusion compelled by accepting grandparents' invitation to read *Peterson* to apply to prevent a parent's "abduction" to defeat the nonparent's standing. See *Peterson*, 112 Ill. 2d at 53-54 (citing *Menconi* with approval and explaining that standing should not turn on mere physical possession, because "[t]o hold differently would be to encourage abductions of minors in order to satisfy the literal terms of the standing requirement and would, in reality, defeat the statutory intendment"). As we concluded above, Molly did not abduct Elliott. Moreover, nothing in the record indicates that she retrieved Elliott in an attempt to defeat grandparents' standing. We note that, in their custody petition, grandparents vaguely alleged: "Only after Molly discovered petitioner's [*sic*] intention did she remove Elliott from petitioner's [*sic*] possession." However, grandparents testified that they first sought legal assistance around November 13, 2010–almost two weeks after Molly retrieved Elliott.[14] Molly could not have intended to defeat standing for a petition that had not yet even been contemplated by the petitioners.

¶ 35    Grandparents also assert that, because Molly did not file an answer to grandparents' custody petition, she is deemed to have admitted the facts alleged in the petition. See 735 ILCS 5/2-610(b) (West 2012) ("Every allegation *** not explicitly denied is admitted ***."). Grandparents assert that they presented a *prima facie* case of standing but point to no specific, relevant fact alleged in their petition. The only allegations possibly relevant to standing are found in paragraph 5 of the petition, which states in its entirety:

    "That Elliott had been continuously living with, and voluntarily in possession of the

---

[14]Ellen also testified that, in October 2009, Molly told Ellen that Molly had heard that Ellen wanted to go to court about Elliott. Ellen told Molly that they could go to court if Molly wanted to but that Ellen would rather not, since their arrangement had been working. Because this conversation was a year before Molly's October 2010 retrieval of Elliott, even assuming *arguendo* that Molly did not believe Ellen, it was too remote in time to support grandparents' speculation that Molly retrieved Elliott to defeat their standing.

petitioner's [*sic*] for a substantial period of time at their home in Long Grove, Illinois. Only after Molly discovered petitioner's [*sic*] intention did she remove Elliott from petitioner's [*sic*] possession. PRIOR TO THAT, Molly spent very little time with Elliott."

The vague and conclusory allegations in this paragraph do not even begin to establish a *prima facie* case of standing, *i.e.*, that Elliott was not in Molly's physical custody when grandparents filed their petition.

¶ 36 Grandparents also argue that the trial court erred in granting Molly's motion for a directed finding. The essence of grandparents' argument is that they had standing. Recasting the same standing argument in the procedural context of the directed finding does not change our conclusion that grandparents lacked standing. Even assuming that grandparents made out a *prima facie* case for standing, the trial court was then allowed to weigh the evidence. See *Orbeta v. Gomez*, 315 Ill. App. 3d 687, 690 (2000). As previously discussed, the trial court's factual determinations supporting its decision that grandparents did not have physical custody of Elliott when they filed their petition were not against the manifest weight of the evidence. See *Orbeta*, 315 Ill. App. 3d at 690.

¶ 37 In light of our holding that grandparents lacked standing, their argument regarding the application of the best-interests-of-the-child analysis is not relevant. Absent a nonparent's standing, the trial court cannot reach the best-interests analysis. *M.C.C.*, 383 Ill. App. 3d at 917 (stating that a nonparent must meet section 601(b)(2)'s standing requirement before the trial court can proceed to the merits of the custody petition); *In re Marriage of Sechrest*, 202 Ill. App. 3d 865, 870 (1990) ("Once the nonparent has *** established standing, the court determines custody using the 'best interest of the child' standard." (quoting *Menconi*, 117 Ill. App. 3d at 396)).

¶ 38 While we recognize that this is a very difficult situation, the bottom line is simply that grandparents refused to believe what Molly told them–that she was ready to resume parenting Elliott. The record reflects that one of the reasons that Molly wanted Elliott to live with grandparents was so that she could work on her GED. Molly was also having difficulty finding suitable housing for herself and Elliott, especially in light of Michael's alleged violations of the order of protection. Grandparents generously supported Molly's efforts by providing for all of Elliott's needs. By May 2010, Molly had earned her GED and established a home in Manteno, with a bedroom outfitted for Elliott. Molly, with Ellen's permission, had Elliott in her Manteno home for more extended periods of time during the summer and fall of 2010. When Molly retrieved Elliott on October 31, 2010, she likely felt she had achieved her goal "to become a better parent" (*Dumiak*, 2012 IL App (2d) 120570-U, ¶ 7).[15]

¶ 39 In sum, we do not create a bright-line rule based upon the number of days that a nonparent waits to file a custody petition. We simply hold that, based on the evidence in the record before us, grandparents failed to demonstrate that Molly did not have physical custody of Elliott at the time they filed their custody petition. Accordingly, under section 601(b)(2),

---

[15]In the previous appeal, we provided an extensive summary of Molly's deposition testimony (*Dumiak*, 2012 IL App (2d) 120570-U, ¶¶ 6-8).

grandparents lacked standing to seek custody.

¶ 40      For the foregoing reasons, we affirm the judgment of the circuit court of Du Page County denying grandparents' custody petition for lack of standing under section 601(b)(2) of the Act.

¶ 41      Affirmed.