NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 241613-U

NO. 4-24-1613

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 18, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| Mary Ann J., | ) | Appeal from the |
|     Petitioner-Appellee, | ) | Circuit Court of |
|     v. | ) | Peoria County |
| Preston C., | ) | No. 23FA64 |
|     Respondent-Appellant. | ) | |
| | ) | Honorable |
| | ) | Caroline Borden Campion, |
| | ) | Judge Presiding. |

---

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice Harris concurred in the judgment.
Justice Cavanagh dissented.

**ORDER**

¶ 1   *Held*:   The trial court erred in awarding third-party custody to petitioner, as she failed to establish that she had physical custody of the children at or around the time she filed her petition.

¶ 2   In March 2024, petitioner Mary Ann J. filed a petition for custody of her minor grandchildren pursuant to section 601.2(b) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/601.2(b) (West 2024)). Respondent Preston C., the children's father, filed a motion to dismiss the petition, arguing that Mary Ann could not prove that she had physical custody of the children as required by the Act. Following an evidentiary hearing, the trial court found that Mary Ann satisfied the physical custody requirement of the Act. The matter proceeded to a best interest hearing, where the court determined that children's best interests were served by removing them from Preston and placing them with Mary Ann.

¶ 3 Preston appeals, arguing that the trial court erred in finding that Mary Ann could establish physical custody of the children in order to succeed on her petition for third-party custody and that the court's best interest determination was flawed from both a legal and factual perspective. We reverse and remand.

¶ 4 I. BACKGROUND

¶ 5 Preston is the biological father of C.B. (born 2008) and J.C. (born 2014). Preston C. and the biological mother, Roseanne B., were never married but lived together in Chicago, Illinois, from 2008 until Preston moved to Peoria, Illinois, in approximately 2017. The children remained in Chicago. The testimony of the parties is somewhat conflicting as to what happened next, but the evidence seems to establish that from that point forward, Mary Ann, the children's maternal grandmother, was responsible for their day-to-day care, as Preston was in Peoria and Roseanne traveled for work and at some point moved to Indiana. While Roseanne lived in Indiana and Preston lived in Peoria, the children remained in Chicago to attend school.

¶ 6 In 2021, Roseanne took the children to Peoria and enrolled them in school for a short period of time. The children returned to Chicago and reenrolled in school in Chicago after Preston's fiancée passed away.

¶ 7 On August 6, 2022, Roseanne unexpectedly passed away. Immediately following the funeral in Chicago, Preston returned to Peoria with both children, where he enrolled them in school. On November 2, 2022, Preston filed an order of protection against Mary Ann. This was precipitated by an incident in which Mary Ann traveled to Peoria and took C.B. from the school bus and returned with him to Chicago. Police were called and an "Amber Alert" was issued for C.B. Mary Ann and the child were located a short time later, and police returned C.B. to Preston. Mary Ann alleged that the children were being abused and that she was rescuing them. The

Department of Children and Family Services investigated the allegations and found them to be unfounded.

¶ 8        Also in November 2022, Mary Ann filed a petition for co-guardianship of the children and moved for the appointment of a guardian *ad litem* (GAL). Approximately six months later, she withdrew the guardianship petition and filed a petition for grandparent visitation in its place. In June 2023, the parties entered into an agreed restraining order, and the trial court entered an order that granted Mary Ann two supervised visits. The order of protection was dismissed without prejudice. In July 2023, the court granted Mary Ann unsupervised visits every other Saturday from 10 a.m. to 6 p.m.

¶ 9        In September 2023, the trial court entered a continuance order that set a final hearing on grandparent visitation and granted the continuation of grandparent visitation as previously established with two additional overnight visitations. The matter was continued on two other occasions, and the December 2023 order continued the previous visitation schedule and granted two overnight weekend visits in Chicago.

¶ 10        On March 15, 2024, prior to the final hearing on grandparent visitation, Mary Ann filed a petition for custody of the children by a third-party pursuant to the Act. The petition was subsequently amended and contended that it was in the best interest of the children that Mary Ann be awarded immediate custody and control of them. Noting what has been sometimes referred to as a standing requirement, the petition asserted that " 'Nonparents must first show that the child is "not in the physical custody of one of his parents." ' " Mary Ann argued that physical possession of the children at the time the petition was filed was not determinative and that the trial court should consider how possession came about and its duration. The petition also argued that Roseanne gave physical custody of C.B. to Mary Ann in 2011 and J.C. in 2015. In the years that

followed, Mary Ann and her ex-husband, Chirstopher H. oversaw the day-to-day care and financial and emotional support of the children. Preston, on the other hand, abandoned the children, "never physically, or financially cared for the minor children, nor expressed any interest in significant parenting time with the minors, years before abducting them."

¶ 11 Preston filed a motion to dismiss the petition for third-party custody, arguing that he never voluntarily or indefinitely relinquished custody of the children; he contended that he regularly exercised visitation during the summer months, holidays, and at other times as agreed to with Roseanne. Moreover, he had physical custody of the children for more than a year and seven months since the death of Roseanne. He acknowledged that prior to Roseanne's funeral, the children were often cared for in Chicago by Mary Ann under the direction of Roseanne.

¶ 12 A. Hearing on Motion to Dismiss Petition for Third-Party Custody

¶ 13 In July 2024, the trial court held a two-day hearing on Preston's motion to dismiss.

¶ 14 1. *Testimony of Preston C.*

¶ 15 Preston testified that he and Roseanne lived together in Chicago with the children from 2008 until he moved to Peoria either at the end of 2017 or the beginning of 2018. He acknowledged that from the time he moved to Peoria through 2022, Mary Ann and Christopher H. were "caretakers" and "helping" with the children as grandparents. The children stayed in school in Chicago after he moved to Peoria and after Roseanne moved to Indiana, although he stated that the children lived with Roseanne in Indiana. However, he also stated that Roseanne traveled frequently, and that a combination of Mary Ann, her current husband, and Christopher would watch the children and transport them back and forth to school, while Mary Ann would bring them from Chicago to Peoria to visit him. He also testified that Mary Ann refused to bring the children to him, and Roseanne would have to bring them to Peoria. He would have the children anywhere

from two to four weeks during the summer from 2018 through 2022.

¶ 16 Preston introduced photographs of himself and the children over the years as evidence that he did not abandon them and exercised visitation. The photographs included those of a trip he and Roseanne took the boys on to Wisconsin when J.B. was around five years old to attend their half-sister's eighth grade graduation, a photo of Preston and the children spending Christmas together in Peoria in 2017, a family reunion in 2018, the Fourth of July in 2019, and additional photos from 2020 and 2021.

¶ 17 Preston explained that he and Roseanne decided that the children would start living with him in Peoria in 2021 and submitted evidence of school transfer records signed by him and Roseanne for both children from the Chicago schools to Peoria schools. However, his fiancée unexpectedly passed away. Roseanne stayed in Peoria with him and the children "for a while," and she then returned the children to Chicago so that Preston could get his affairs in order. Roseanne had told him that Mary Ann would take the children back and forth to school but at no point did he ever relinquish legal custody of the children. He also introduced receipts of what appeared to be money orders he sent to Roseanne for financial support of the children.

¶ 18 2. *Testimony of Christopher H.*

¶ 19 Christopher testified that he was the children's nonbiological grandfather who, along with Mary Ann, was responsible for the day-to-day care of the children until Preston removed them from Chicago in 2022. Mary Ann had taken "custody" of C.B. when he was two years old and, later, J.B. when he was about one year old. During that time, the children attended Chicago schools and he and Mary Ann provided financial support for the children without the assistance of Roseanne or Preston. Preston never assisted with medical care for the children. Roseanne moved frequently and traveled extensively. The children did not move to Indiana with

Roseanne in 2019. Because legal custody was never transferred, Roseanne would have to arrange for medical appointments, among other things, and Christoper and Mary Ann were listed on the children's school records along with Roseanne.

¶ 20 Christopher also testified that the children were briefly unenrolled from Chicago schools on August 23, 2021, but reenrolled on September 21, 2021. Roseanne brought the children to Peoria with the intention of living in the area, but she ultimately returned the children to Mary Ann's and his care because they were being left alone in Peoria. He disputed Preston's testimony that he would have visitation with the children for extended periods during the summer or on holidays but acknowledged Preston had the children in 2019 for several days in July. The children attended karate camp every summer in Chicago from 2018 on except for 2020 due to the pandemic. Following Roseanne's funeral, Preston took the children to Peoria without informing Christopher or Mary Ann.

¶ 21 3. *Testimony of Mary Ann J.*

¶ 22 Mary Ann had taken care of C.B. on a day-to-day basis since he was two years old until Preston took him to Peoria in 2022. Christopher obtained physical possession of J.B. when he was a toddler, and the two shared the responsibility of taking care of him. Mary Ann and Christopher provided the children with transportation to school, helped them do their homework, provided food and clothing, enrolled them in extracurriculars, and kept them up to date on medical care. Mary Ann did not receive any financial support from Roseanne or Preston for the care of the children. Preston never obtained "physical custody" of the children during summers, school breaks, holidays, or spring breaks. Mary Ann never filed for legal custody of the children while Roseanne was alive.

¶ 23 Roseanne temporarily took the children to Peoria and enrolled them in school there

after she and Mary Ann had a "falling out." Roseanne was gone with the children for two or three weeks before they were returned to Mary Ann and re-enrolled in Chicago schools. In Mary Ann's opinion, Preston abandoned the children, as he never spoke to them on the phone, provided no financial support, did not ask to see them on holidays or summer break, and did not maintain a reasonable degree of interest in their lives.

¶ 24                    4. *Testimony of Anita S.-C.*

¶ 25          Anita S.-C. is the children's paternal grandmother, and she testified that Roseanne and Preston moved in with her in Chicago when C.B. was a week old, and they all lived together until 2013, when C.B. was about seven or eight years old; it was then that Anita moved to Peoria. After the move, she would see the children about every two months, and sometimes for a week or two during the summer, but she did not see them on holidays. She stated that the children resided with Roseanne when she lived in Indiana.

¶ 26          5. *Trial Court's Ruling and Preston's Interlocutory Appeal*

¶ 27          On August 2, 2024, the trial court issued a written order finding that Mary Ann had satisfied the statutory requirement of physical custody to proceed with the third-party petition for custody. The court acknowledged that the case was "unique" in that Preston had physical possession of the children since Roseanne's funeral in 2022, but the court found that he had relinquished custody prior to that when the children had lived with Mary Ann for at least the last 5 years, and possibly 10. The court stated in its order that "[w]hen a noncustodial parent has not been found unfit, and has regularly exercised visitation and demonstrated interest in the child, it is proper that noncustodial parent have custody." See *In re Marriage of Brownfield*, 283 Ill. App. 3d 728, 733 (1996). While the court acknowledged Preston exercised some visitation with the children, they were not "vigorous" attempts at visitation. Generally, the court found that the

- 7 -

testimony of Mary Ann and Christopher was credible while Preston's testimony was not.

¶ 28 The trial court found physical custody to be with Mary Ann after considering the following factors: (1) who was responsible for the welfare of the children prior to the initiation of custody proceedings; (2) the manner in which physical possession of the children was acquired; (3) the nature and duration of the possession; and (4) the "many years" of day-to-day care and financial support by Mary Ann. The court directed the parties to prepare for a best interest hearing on the third-party custody petition.

¶ 29 Preston filed a petition for leave to appeal with this court pursuant to Illinois Supreme Court Rule 306(a)(5) (eff. Oct. 1, 2020), arguing that the trial court's finding that Mary Ann had physical custody of the children was against the manifest weight of the evidence. Moreover, Preston argued that he never relinquished custody and that the filing of the petition for grandparent visitation was the antithesis of the petition for custody, as it acknowledged Mary Ann did not have physical custody of the children. We denied the petition for leave to appeal. *Mary Ann J. v. Preston C.*, No. 4-24-1093 (2024) (unpublished minute order).

¶ 30 B. Best-Interest Hearing

¶ 31 On November 25, 2024, the trial court held a best interest hearing on the petition for custody.

¶ 32 1. *Testimony of Preston C.*

¶ 33 Preston testified that he worked a part-time job at a food truck Monday through Saturday. The hours varied, but he usually began work around 2 p.m., and then "it depends" on when his shift ends. He may take a break and then come back to work later that evening depending on the number of customers. He also worked as a master barber, cutting individuals' hair either at his house or his clients' houses, although he had not renewed his license since 2004.

- 8 -

¶ 34    Prior to 2022, he would see the children "whenever" he wanted, possibly over 60 times a year, sometimes twice a week. In Peoria, the children attended after school activities at the Dream Center. They typically arrived home via bus between 5:45 and 7 pm. School reports evidenced that J.C. had 19 unexcused absences and 15 tardies for the 2023-24 school year in Peoria. C.B. had 16.5 unexcused absences. The grades for both children were mostly As and Bs, although standardized testing showed they were performing slightly below average in some subjects.

¶ 35    When attempting to explain the school absences, Preston stated C.B. was sick, stressed, and must have had COVID. Preston also said J.B. had a "life-threatening" illness that placed him in the hospital for a week or more. Preston could not remember what the diagnosis or treatment were, or the exact dates J.B. spent in the hospital. He claimed to have told the school about the incident.

¶ 36    Preston provided the children with clothes and shoes, and he kept them looking clean and orderly. Although he said the children had a counselor to talk to at the after-school program, he was unaware of the individual's credentials, how long the children received counseling, or if they still saw the counselor.

¶ 37    J.C. had joined the school's basketball team and C.B. was a mentor at the Dream Center. They also started training for a podcast a couple of weeks prior and they practiced three times a week. Photographs were admitted of the children at church, basketball, and a podcast practice. Photographs of the children's rooms at the father's house depicted clean and appropriate bedrooms. A Ring doorbell video was also admitted, which showed Mary Ann at Preston's mother's home in Peoria shortly after Roseanne's funeral. In the video, Mary Ann physically confronted Preston and charged at him before purposely kicking over a lit grill.

¶ 38                                    2. *Testimony of Christopher H.*

¶ 39        Christopher explained that when the children lived in Chicago they were enrolled in many activities, such as church and karate. They were good students in Chicago. He believed the children were depressed, upset, and having trouble, stating that their entire lives changed after the funeral when Preston took them to Peoria. While staying with Preston, the children were unkept and unhappy. Christopher and Mary Ann needed to buy the children items such as clothes because other children had teased them about theirs being dirty or worn. Christopher believed the children had not addressed their mother's death and is a firm believer in counseling.

¶ 40                                    3. *Testimony of Mary Ann J.*

¶ 41        Mary Ann had lived in the same Chicago home for 14 years and had worked at a health care company for the last 3 years. She once again testified that she raised C.B. since about 2010 and J.C. since about one year after he was born, and both continued to live with her until Roseanne's death. Roseanne had an addiction problem with controlled substances and was not taking care of the children, requiring Mary Ann to "step in." With Roseanne's frequent moves and traveling, she saw the children "when she wanted to" and would infrequently pick them up and bring them to Peoria. Roseanne brought the children to Peoria but denied it was 60 times a year as claimed by Preston. When pressed on the frequency of trips to Peoria, Mary Ann stated, "[m]aybe once a month, every other month. But it was every couple of months because she'd go through phases." The visits were during the weekends and sometimes they would be overnight. When confronted with the allegation in her verified petition that Preston had abandoned the children, she claimed the visitation "wasn't anything consistent" and was always initiated by Roseanne rather than Preston asking to see the children. Roseanne would usually take them to Peoria when Mary Ann had upset Roseanne. Preston had taken the children after the funeral without notice, and the

Ring video was taken the next day when she confronted Preston.

¶ 42     J.C.'s report card for the last period he was at the Chicago school showed mostly As and Bs with one C and no tardies or absences of any kind. C.B.'s report card for the same period was similar, showing similar grades and no tardies or absences.

¶ 43     Mary Ann bought the children additional clothes and school supplies. The children were unkept and were often "teased" by other children in Peoria about their clothes and appearance. Mary Ann introduced photographs and explained that J.C. had an open wound on the back of his knee during one of the visits that was unaddressed by Preston. The children also needed counseling because they were having difficulty with the passing of their mother.

¶ 44                    4. *Testimony of Ivan B. and Marissa C.*

¶ 45     Ivan B. (biological father of Rosanne) testified that he lived in Markham, Illinois, and that Preston, Anita, and Roseanne all lived together with the children in Chicago until sometime between 2017 or 2018, and he would visit them regularly. Even after Preston moved to Peoria, Roseanne and Preston would spend time with him at his timeshare near Ottawa, Illinois, during the summers for about a week at a time.

¶ 46     Marissa C. (Preston's daughter and the children's half-sister) lived out of state with her mother growing up and would visit Preston. She spent summers with Preston and the children were present for part of her visits.

¶ 47                    5. *GAL Report*

¶ 48     The report from the GAL noted that while Preston claimed that the children resided with Roseanne in Indiana, the school and medical records along with her conversations with the children all showed that the children resided in Chicago, with Mary Ann and Christopher being the primary caretakers.

¶ 49        The GAL report opined that Preston was an obstructionist when it came to contact between the children and the maternal grandparents, noting phone calls would go unanswered. The children confided that after about five minutes on the phone with the grandparents, Preston would tell them to "wrap it up." On several occasions Preston had told the children that Mary Ann and Christopher "killed their mother by 'pulling the plug.' " Preston had also told the GAL and the children that the grandparents only wanted custody of the children because of the money (social security and state benefits).

¶ 50        C.B. had difficulty adjusting to moving to Peoria, while J.C. adjusted more quickly because he was younger. Both children said that they spent a lot of time with their paternal grandmother while staying in Peoria and did not know whether Preston was employed.

¶ 51        Essentially, the children had been living in Chicago with Mary Ann prior to Preston moving them to Peoria. The children were thriving in Chicago with "good grades, lots of family, lots of friends. They were happy there." While Preston did see the children, it did not appear that "it was as often as he would like everyone to believe. It doesn't appear he was really 'there' for them … financially, emotionally[,] nor supporting them in their academic lives." The GAL opined that maybe Preston truly believed the children live in Indiana with the mother "because he wasn't really a part of their life and didn't know that the grandparents were raising them." Mary Ann had been the nurturing influence in the children's lives and they were not receiving that from Preston.

¶ 52        The GAL recommended the trial court should conduct an in-camera interview with the children, which ultimately did not occur, and opined that Mary Ann should be granted full custody of the children, as it was in their best interest to return to Chicago and reside with Mary Ann.

¶ 53                        6. *Trial Court's Order*

¶ 54 On December 16, 2024, the trial court entered an order granting custody to Mary Ann, and ordering that the children be transferred from Peoria to Chicago over the school winter break. Regarding credibility, the court found the testimony of Mary Ann and Christopher credible while the testimony of Preston was not credible.

¶ 55 Mary Ann and Christopher exercised significant decision making regarding the children prior to their move to Peoria. The trial court pointed to the number of unexcused absences from school as "alarming." While Preston stated he had alerted the school to a serious illness for one of the children, if that were true the absences would have been excused. If the absences were due to "mental issues" from the loss of the mother, Preston had failed to seek "appropriate counseling for them." Preston's discussion of the counseling the children were receiving was deficient in that he did not know whether the children actually received counseling, whether they were still receiving counseling, and the qualifications of the individual providing the counseling.

¶ 56 The statutory factors relating to mental and physical health weighed in favor of Mary Ann. Although Preston stated one of the children was hospitalized for a life threatening condition, he could not recall any details about the illness, treatment, or diagnosis. He was also against the children receiving psychological care. The way he removed the children from Chicago without consideration of how it would impact them was also concerning. The trial court was also suspicious of the children being enrolled in extracurricular activities just weeks prior to the hearing.

¶ 57 Preston's testimony regarding the stability of the home environment was "again concerning," as Preston was away variable hours working at the food truck but also saw individuals all hours of the day for hair appointments at the home. The trial court also agreed with concerns laid out in the GAL report. The court found that Mary Ann was able to provide a more stable

environment for the children and Preston's testimony was simply not credible. The court did not mention the presumption in favor of a natural parent's superior right to raise their children.

¶ 58      This appeal followed.

¶ 59                                II. ANALYSIS

¶ 60      On appeal, respondent argues that the trial court erred in finding that Mary Ann could satisfy the statutory requirement of physical custody of the children necessary to proceed on the petition for third-party custody. He also argues that the court's decision—that it was in the children's best interest to transfer custody to Mary Ann—was against the manifest weight of the evidence.

¶ 61      Initially, we note that this is an accelerated case filed under Illinois Supreme Court Rule 311(a) (eff July 1, 2018). Accordingly, this court was required to issue its disposition in the matter within 150 days after the notice of appeal was filed absent "good cause shown." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). Given the weighty considerations involved in this appeal the court required additional time to thoroughly consider the arguments presented, the court finds good cause for issuing our disposition beyond the 150-day deadline.

¶ 62      Turning to the merits, we begin by noting Mary Ann did not file an appellee's brief in this matter. In *Thomas v. Koe*, 395 Ill. App. 3d 570, 577 (2009), this court explained that in the absence of an appellee's brief a reviewing court may exercise three discretionary options:

> "(1) [a reviewing court] may serve as an advocate for the appellee and decide the case when the court determines justice so requires, (2) it may decide the merits of the case if the record is simple and the issues can be easily decide without the aid of the appellee's brief, or (3) it may reverse the circuit court when the appellant's brief demonstrates *prima facie* reversible error that is supported by the record."

(citing *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976)).

¶ 63 This case presents weighty issues related to the custody of two minor children. If we affirmed simply because of the absence of an appellee's brief, one party's inaction would control the very important decision concerning these two children. Moreover, the record is well preserved and a well-established body of caselaw governs its disposition, so we feel capable of considering the issues presented without an appellee's brief. Further, as discussed below, Preston has demonstrated *prima facie* reversible error that is supported by the record.

¶ 64 The Act allows for the filing of a petition for the allocation of parental responsibilities by a third party if the child is not "in the physical custody of one of his or her parents." 750 ILCS 5/601.2(b)(3) (West 2024). In other words, only a person with physical custody of a child can utilize this statutory provision. The term physical custody cannot be equated to physical possession; it is instead a term of art in this context, with a significant body of caselaw addressing its meaning. The physical custody requirement is meant to safeguard a natural parent's superior right to the care and custody of their children. *In re Custody of K.N.L.*, 2019 IL App (5th) 190082, ¶ 17. "Whether a child is in the physical custody of a parent 'is not subject to a clear test.' " *Young v. Herman*, 2018 IL App (4th) 170001, ¶ 53 (quoting *In re Custody of M.C.C.*, 383 Ill. App. 3d 913, 917 (2008)). A nonparent seeking custody bears the burden of establishing that the parent voluntarily and indefinitely relinquished custody whether by a calculated decision on the parent's part or via abandonment. *Id.*; *In re Petition of Kirchner*, 164 Ill. 2d 468, 491 (1995), *abrogated on other grounds by In re R.L.S.*, 218 Ill. 2d 428 (2006).

¶ 65 In determining whether the nonparent has established some measure of voluntary relinquishment, the trial court may also consider the following factors: "(1) who was responsible

for the care and welfare of the child prior to the initiation of custody proceedings; (2) the manner in which physical possession of a child was acquired; and (3) the nature and duration of the possession." *Young*, 2018 IL App (4th) 170001, ¶ 54; *Brownfield*, 283 Ill. App. 3d at 736. A finding of voluntary and indefinite relinquishment depends heavily on the particular facts of the individual case (*In re Custody of Kulawiak*, 256 Ill. App. 3d 956, 962 (1993)), and following an evidentiary hearing will be affirmed on appeal unless it is against the manifest weight of the evidence (*Young*, 2018 IL App (4th) 170001, ¶ 56).

¶ 66    Here, we find that Mary Ann established that Preston had voluntarily and indefinitely relinquished his parenting responsibilities along with physical custody of the children prior to Roseanne's funeral. The testimony established that both Roseanne and Preston were aware of and agreed to the arrangement where the children would reside with Mary Ann and Christopher in order to attend school in Chicago. In doing so, Mary Ann was left in charge of the day-to-day care of the children for, at the minimum, three years prior to the death of Roseanne, and quite possibly the majority of their lives. The trial court below made credibility determinations and found that testimony other than Preston's was credible and established that Mary Ann had cared for the children since they were infants. We find no fault with these determinations. See *id.* ¶ 70 (noting a reviewing court affords great deference to the trial court's credibility determinations). Nonetheless, the court below failed to consider that even when relinquished, a parent can reestablish physical custody of a child. See *Dumiak v. Kinzer-Somerville*, 2013 IL App (2d) 130336, ¶¶ 25-28.

¶ 67    The issue with the trial court's ruling is laid bare in Preston's argument that the court considered the wrong time frame in determining whether Mary Ann had physical custody. The court noted that this case posed unique facts leading up to the filing of the petition for third-

party custody. The testimony the court below found credible established that Mary Ann was the primary caretaker for the children for most of their life. Shortly after Roseanne's death, Preston removed the children from her care unilaterally and without notice. As Preston's counsel noted, the matter started as an order of protection that then evolved into a request for guardianship, then grandparent visitation, and finally the petition for third-party custody.

¶ 68        Courts have long held that the relevant time for determining whether a nonparent has physical custody of a child is the time the petition is filed. See *In re Marriage of Archibald*, 363 Ill. App. 3d 725, 736 (2006) ("Whether a nonparent has the custody of the minor child is determined by examining the nonparent's status on the date relief is sought."); *Dumiak*, 2013 IL App (2d) 130336, ¶ 26; *Brownfield*, 283 Ill. App. 3d at 739. There is a limited exception to this general rule: where a noncustodial parent has unilaterally removed a child from a situation similar to what the trial court found existed here, we have refused to allow that unilateral action to be dispositive of the physical custody finding. See *Kulawiak*, 256 Ill. App. 3d at 963 (holding the trial court must examine living conditions as they existed before unilateral action by a party to terminate prior arrangement as to physical custody); *In re Custody of Peterson*, 112 Ill. 2d 48, 53-54 (1986) (noting physical custody "should not turn on" who had the child when the custody petition was filed); *Young*, 2018 IL App (4th) 170001, ¶ 59 (finding that unilaterally obtaining physical possession of the child for approximately two months was insufficient to overcome the voluntary relinquishment of parental duties over the previous eight years).

¶ 69        This limited exception prevents a petition for third-party custody from being preemptively defeated by the precipitous act of wresting a child away from his or her current custodian before a petition can be filed. Consequently, a custodian who had custody of the child but lost it due to such conduct may still utilize the statute under which custody gives rise to the

right to file.

¶ 70 In applying the exception, the question often becomes whether the erstwhile custodian waited too long before acting. In this case, Mary Ann waited approximately three months before taking *any* legal action to restore her custody of the children. When she finally acted, she filed, not a petition to restore her third-party custody, but one seeking guardianship of the children. We might look past the difference in the legal theories in consideration of the fact that both seek to establish custody in the petitioner, but the guardianship petition was voluntarily dismissed after approximately six months. At that time, Mary Ann changed her legal theory to one seeking only grandparent visitation, and not custody. The significance of the change is dispositive: instead of challenging Preston's custody, she implicitly accepted it by asking for only visitation rights. Mary Ann did not file the petition at issue here seeking third-party custody until March 2024; approximately 18 months after Preston took the children back and more than a year after she dropped her guardianship petition in favor of a request for visitation rights.

¶ 71 While we do not question the sincerity or purpose of Mary Ann's petition, the foregoing timeframe simply does not reflect the prompt action necessary when a third party's *de facto* custody has been terminated by a parent's unilateral action in retrieving the children. In *Kulawiak*, 256 Ill. App. 3d at 959, the petitioner only waited three days after the child was removed from their care, and in *Young*, 2018 IL App (4th) 170001, ¶ 59, the petitioner waited approximately two months. If Preston defeated Mary Ann's custody of the children by retrieving them, the onus was on her to move quickly. The foregoing timeline simply does not show such promptness.

¶ 72 We recognize the fact that our decision will again require disruption and change for these children, who have known too much of it in their young lives. However, in recognition of a natural parent's superior rights, we must ensure that any intrusion into parental custody is

undertaken in conformity with the applicable statute. Hopefully, future litigants seeking to establish third-party custody will clearly understand the need to act promptly if their custody has been interrupted by a recent disruption. Having found the trial court erred in finding that Mary Ann established the perquisite of physical custody of the children, we need not consider Preston's additional contentions of error relating to the court's best interest determination.

¶ 73                                III. CONCLUSION

¶ 74        For the reasons stated, we reverse the trial court's judgment and remand for further proceedings.

¶ 75        Reversed and remanded.

¶ 76        JUSTICE CAVANAGH, dissenting:

¶ 77        I respectfully dissent. In my view, the trial court correctly found Mary Ann satisfied the physical custody requirement in section 601.2(b)(3) of the Act (750 ILCS 5/601.2(b)(3) (West 2024)). Section 601.2(b)(3) of the Act allows a nonparent to file a petition for the allocation of parental responsibilities "only if [the child] is not in the physical custody of one of his or her parents." *Id.* The physical custody requirement is meant to safeguard a natural parent's superior right to the care and custody of their children. *K.N.L.*, 2019 IL App (5th) 190082, ¶ 17. However, determining whether a parent has "physical custody" is not dependent on "physical possession." *Supra* ¶ 64.

¶ 78        If we afford great deference to the trial court, as we should, we should find Mary Ann established Preston had voluntarily and indefinitely relinquished his parental responsibilities. The court specifically made credibility determinations and thereafter found the parents had agreed to allow Mary Ann and Christopher to care for the children in Chicago and tend to their day-to-day care—as has been the case for the majority of the children's lives. Preston knowingly allowed

Mary Ann to raise his children, exercised infrequent visitation, and was seemingly satisfied with a distant relationship with his children, both in physical proximity and emotional connection.

¶ 79 Only upon Roseanne's death did Preston seek physical possession of the children, when he unilaterally and unexpectedly removed them from Mary Ann's care. Until then, Preston made no effort to gain custody or, at minimum, interrupt Mary Ann's caretaking. But, when Preston removed the children, Mary Ann immediately began taking measures to litigate her perceived superior care of the children. In finding the trial court's decision was against the manifest weight of the evidence, the majority found Mary Ann "waited too long before acting." *Supra* ¶ 70. I respectfully disagree that the time frame was dispositive in this highly unusual case.

¶ 80 Instead, I would find Mary Ann acted with prompt diligence upon Preston's removal of the children. She arrived at Preston's house within a day to reclaim them. After that, the record is unclear about what actions she personally took to pursue the children, but I would venture to guess she sought legal advice from possibly more than one attorney—things that take time and are out of her control.

¶ 81 Affording the trial court great deference in its credibility determination and in its ultimate decision, I would affirm the court's order finding Mary Ann had satisfied the physical custody requirement of the Act and that the best interests of the children are better served in their current placement with her. I would find the court's order was not against the manifest weight of the evidence.

¶ 82 Accordingly, based on the above, I respectfully dissent from the majority's decision and would affirm the trial court's judgment.